USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/2/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
RYAN PRENDERGAST,                              :

                      Plaintiff,     :

        -against-                          :

ANALOG MODULES, INC.,                          :

                   Defendant.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

08 Civ. 6891 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiff Ryan Prendergast ("Prendergast") brings this products liability and

negligence action against Defendant Analog Modules, Inc. ("AMI"). AMI moves for summary

judgment on all claims, and to strike certain aspects of Prendergast's Statement of Material

Facts. For the following reasons, Defendant's motion for summary judgment is granted.

Defendant's motion to strike is denied as moot.


BACKGROUND

This case arises out of an accident that occurred on July 7, 2006, while

Prendergast was servicing a Medlite C6 laser (the "Machine") in a Manhattan dentist's office.

(Pl. 56.1 Stmt. ¶¶ 1, 3.) The laser was designed and manufactured by Hoya ConBio ("HCB").

(Pl. 56.1 Stmt. ¶ 4.) AMI designed and manufactured a single component of the laser, a high-

voltage power supply ("HVPS"). (Pl. 56.1 Smt. ¶ 5.) In addition, AMI supplied a high-voltage

cable assembly ("Cable Assembly") that connected the HVPS to a capacitor. (Pl. 56.1 Stmt. ¶ 5;

Def. 56.1 Reply ¶ 5.) Electricity to the Machine flows from a 120-volt wall socket to the HVPS,

which transforms the 120-volt power to 1,500-volt power. (Pl. 56.1 Stmt. ¶ 13; Def. Reply ¶ 13.) The high-voltage power is then transferred from the HVPS to the capacitor via the Cable Assembly. (Pl. 56.1 Stmt. ¶ 13; Def. Reply ¶ 13.) The Cable Assembly connects to the HVPS via a "BNC" cable connection, which has a cylindrical housing surrounding a recessed pin-shaped contact point (the "BNC Pin"). (Pl. 56.1 Stmt. ¶ 19.) The recessed nature of the pin appears designed to prevent accidental contact while the pin is energized. (See Def. 56.1 Stmt. ¶ 22.)

The capacitor is a power storage device that maintains dangerous levels of high-voltage power for several minutes even after it has been disconnected from external power sources. (Pl. 56.1 Stmt. ¶ 19.) In contrast, the HVPS is a power conversion device, not a power storage device. (Pl. 56.1 Stmt. ¶¶ 26, 27.) When the HVPS is disconnected from external power sources, it is drained of all high-voltage power within a matter of seconds. (Pl. 56.1 Stmt. ¶ 27.) All experts in this case agree that the HVPS could not have been the source of Prendergast's injuries. (Pl. 56.1 Stmt. ¶ 29.) The capacitor is equipped with both primary and secondary discharge systems. The primary discharge system is an "active charge dump circuit" that discharges 98% of the capacitor's initial voltage within 12 seconds. (Pl. 56.1 Stmt. ¶ 33.) The secondary discharge is a passive "bleed" resistor that will discharge the capacitor in approximately 10 minutes. (Pl. 56.1 Stmt. ¶ 33.) Prendergast was employed at HCB for 13 years, during which time he received extensive training in electrical safety practices. (Pl. 56.1 Stmt. ¶¶ 40-41.)

On July 7, 2006, the Machine produced an "error" message, and Prendergast, an HCB technician, was dispatched to make repairs. (Pl. 56.1 Stmt. ¶ 51.) During the course of the

service call, Prendergast unplugged the power cord from the wall and then waited approximately

10-15 minutes before removing the Machine's outer casing.  (Pl. 56.1 Stmt. ¶ 54.)  He then

disconnected the power running to the HVPS and disconnected the BNC connection from the

HVPS output, placing the loose end of the cable with the BNC Pin behind other components in

the Machine.  (Pl. 56.1 Stmt. ¶¶ 55-56.)  Prendergast attempted to remove the HVPS from the

Machine, at which point he received a high-voltage shock.  (Pl. 56.1 Stmt. ¶ 8, 63.)  After the

accident, it was discovered that the original error message was the result of a burned "bridge

rectifier" within the HVPS.  (Def. 56.1 Stmt. ¶ 71; Pl. 56.1 Stmt. ¶ 70, 71.)

      Prendergast theorizes that the BNC Pin came into contact with an unknown metal

protrusion within the Machine, providing a discharge pathway for electricity to flow from the

Cable Assembly to other conductive components of the Machine, which he touched while

attempting to remove the HVPS.  He asserts that an inexpensive plastic shielding cover would

have prevented his injury, and that such covers were in use at the time by one of AMI's

competitors.  (Pl. 56.1 Stmt. ¶ 62.)


## DISCUSSION

### I. Legal Standard

      A party seeking summary judgment must demonstrate the absence of a "genuine

dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986);

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A dispute about a material fact is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Liberty Lobby, 477 U.S. at 248.  If the moving party meets its burden to "show that no

genuine factual dispute exists," Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241,

244 (2d Cir. 2004), "the non[-]moving party must come forward with specific facts showing that

there is a genuine [dispute] for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986).  The Court resolves all factual ambiguities and draws all inferences in

the non-moving party's favor. Liberty Lobby, 477 U.S. at 255.  "Nonetheless, summary

judgment is appropriate where . . . undisputed facts reveal that the plaintiff cannot establish an

essential element of the claim, on which element the plaintiff has the burden of proof, and the

plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a

verdict in his or her favor on that element." In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501,

509 (2d Cir. 2010).  Thus, a motion for summary judgment "will not be defeated merely . . . on

the basis of conjecture or surmise." Gottlieb v. Cty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996).


II. Design Defect

        "In order to establish a prima facie case in strict product liability for design

defects, the plaintiff must show that the manufacturer . . . marketed a product designed so that it

was not reasonably safe and that the defective design was a substantial factor in causing

plaintiff's injury." Adams v. Genie Indus., Inc., 929 N.E.2d 380, 384 (N.Y. 2010).

Prendergast's theory—that the electrical charge originated in the Cable Assembly and was

discharged to the Machine when the BNC Pin came into contact with an unknown metal

protrusion—is without support in the record.  His own expert, Thomas Smith ("Smith") testified

that in his view, it was "likely" that Predergast came in contact directly with the BNC Pin.

(Affirmation of David J. DeToffol dated May 13, 2011 ("DeToffol Aff."), Ex. 9: Deposition of

Thomas D. Smith dated Mar. 24, 2011 ("Smith Dep.") 37.)  The other possibility, according to

Smith, is that Prendergast came into contact with the high-voltage port on the side of the HVPS.

(Detoffol Aff. Ex. 10: Expert Report of Thomas D. Smith 6, ¶ 2.)  Notably, Smith did not opine

that Predergast was injured as a result of an electrical discharge from the Cable Assembly to a

protruding metal component within the Machine.  The only support for Predergast's theory

comes from AMI's expert, Michael Aucoin ("Aucoin").  But although Aucoin conceded that this

theory was a "possibility," he described the possibility as "pathological, as in farfetched" and

"almost impossible."  (Detoffol Aff. Ex. 7: Deposition of Michael Aucoin dated Mar. 25, 2011

43, 46.)  Faced with such scant evidence, no reasonable juror could find that a purported defect

in the Cable Assembly's design was a substantial factor in causing Prendergast's injuries.

Accordingly, summary judgment is granted in favor of AMI on Prendergast's design defect

claim.


II.  Manufacturing Defect

        Prendergast also asserts a manufacturing defect claim, arguing that the defective

bridge rectifier in the HVPS created the need for his service call, thereby placing him in the zone

of danger.  "Whether an action is pleaded in strict products liability, breach of warranty, or

negligence, the plaintiffs must prove that the alleged defect is a substantial cause of the events

which produced the injury."  Fahey v. A.O. Smith Corp., 908 N.Y.S.2d 719, 723 (N.Y. App. Div.

2010); see also Amatulli v. Dehli Const. Corp., 571 N.E.2d 645, 649 (N.Y. 1991) ("For there to

be a recovery for injuries or damages occasioned by a defective product . . . , that defect must

have been a substantial factor in bringing about the injury.") "Defendants are liable for all normal and foreseeable consequences of their acts." Gordon v. E. Ry. Supply, 82 N.Y.2d 555, 562 (1993). "An independent intervening act may constitute a superseding cause, and be sufficient to relieve a defendant of liability, if it is of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." Gordon, 82 N.Y.2d at 562.

Prendergast's theory of causation is too attenuated to impose liability on AMI based on any manufacturing defect in the bridge rectifier. He does not argue that the faulty bridge rectifier directly caused his injuries. Instead, he argues that the shock arose from a design defect in the Cable Assembly. Assuming for the moment that the Cable Assembly was defectively designed, that defect was an independent intervening event and superseding cause. Although causation is typically a fact-intensive inquiry not suitable for summary judgment, where a defect merely placed the plaintiff at the scene of his injuries, there is no causation as a matter of law. See Ventricelli v. Kinney Sys. Rent a Car, 383 N.E.2d 1149 (N.Y. 1978) (automobile lessor who negligently supplied a car with a defective trunk lid not liable to the lessee who, while stopped to repair the trunk, was injured by the negligent driving of a third party). Under Prendergast's manufacturing defect theory, his injuries were the result of an intervening defect that "operate[d] upon but d[id] not flow from the original" defect. Deridarian v. Felix Contracting Corp, 414 N.E.2d 666, 671 (N.Y. 1980). "Although the [manufacturing defect] undoubtedly served to place [Prendergast] at the site of the accident, the intervening [defect] was divorced from and not the foreseeable risk associated with the original [defect]." Derdarian, 414 N.E.2d at 671. Accordingly, Prendergast's manufacturing defect claims are

dismissed.  To the extent that such claims sound in negligence, they are also dismissed based on the analysis set forth above.

## CONCLUSION

For the foregoing reasons, Defendant Analog Modules, Inc.'s motion for summary judgment is granted.  Defendant's motion to strike is denied as moot.  The Clerk of Court is directed to terminate the motion pending at ECF Nos. 19 and 33 and mark this case closed.

Dated: September 2, 2011
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record*

David J. Detoffol, Esq., P.C.
305 Broadway, Suite 1101
New York, NY 10007
*Counsel for Plaintiff*

Brian Thomas Stapleton
Goldberg Segalla, LLP(WhPls)
11 Martine Ave, Suite 750
White Plains, NY 10606
*Counsel for Defendant Analog*